# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JONATHAN MICHALE S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 17-cv-1339-JPG |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM AND ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for benefits in February 2014, alleging disability beginning at his birth on May 13, 1985. He also applied for Child's Insurance Benefits. A prior application had been denied by an ALJ on December 21, 2010, which was after his 22nd birthday. Plaintiff concedes that the application for Child's Benefits is precluded by the denial of the prior application and that the operative date of onset for his SSI claim is date on which he filed his application. See, Doc. 10, footnotes 1 and 2.

After holding an evidentiary hearing, ALJ Jason R. Yoder denied the application in a written decision dated February 10, 2017. (Tr. 13-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto. The Court spells plaintiff's middle name as it was spelled in the complaint, "Michale."

been exhausted and a timely complaint was filed in this Court.

## **Plaintiff's Arguments**

Plaintiff makes the following arguments:

1. The ALJ erred in weighing the opinions of plaintiff's treating psychiatrist, Dr. Parvaz, and of the state agency reviewers.

2. The ALJ did not properly evaluate plaintiff's testimony.

## **Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.[2]

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

---

[2] The legal standards for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) are largely the same. The above paragraph in this order cites the relevant statutory provisions for DIB, while the SSI provisions are located at 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D), and 20 C.F.R. § 416.972. Most citations herein are to the DIB regulations out of convenience, but also apply to SSI challenges.

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Yoder followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the date of the

application. He found that plaintiff had severe impairments of borderline intellectual functioning with mathematics disorder; attention deficit hyperactivity disorder; bipolar disorder; and asthma. These impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, with the following limitations:

> Avoid concentrated exposure to fumes, dust, odors, gases, areas of poor ventilation, humidity, and temperature extremes such as heat and cold. The claimant can understand and remember simple instructions and carry out simple, routine tasks that require little independent judgment or decision-making in two hour segments at a time with a short 10-15 minute rest between two segments at an average production rate pace, but should not perform tasks with stringent speed or strict rate based production requirements and involving few if any daily changes in a work task or work environment. The claimant can perform only very simple addition and subtraction math problems without a calculator, but is able to use a calculator for more difficult problems. He cannot perform tasks which require intensely focused concentration/attention, such as soldering on an assembly line for example which require the incumbent worker to maintain careful hand-eye coordination at all times and makes it difficult to take even a brief break to look at a clock or to have a brief conversation with co-workers, but the claimant could perform tasks that would allow those type[s] of behavior[s] such as assembling objects at a table for example. He would be off task for 10 percent of the workday in additional to regular breaks due to ADHD symptoms. He can perform tasks that do not require interaction with the public, but he can have occasional interaction with co-workers and supervisors. (Tr. 20).

Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because he was able to do jobs which exist in significant numbers in the local and national economies.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1.   **Agency Forms**

The December 21, 2010, decision denying plaintiff's prior application is at Tr. 82-104.

Plaintiff was born in 1985 and was almost 29 years old when he applied for SSI in February 2014. (Tr. 272). He graduated from high school but was in special education classes. (Tr. 277).

In May 2014, plaintiff submitted a report stating that he was unable to work because he was learning disabled and needed instructions repeated to him many times. He lived with his family. He helped out with chores inside and outside of the house. He played videogames with his brother and watched television. He was able to drive short distances with someone else with him. He was unable to count change or handle a bank account. (Tr. 300-307).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in October 2016. (Tr. 43). Counsel agreed with the ALJ that the only viable application was the one for SSI, and the onset date would be the date the application was filed. (Tr. 45).

Plaintiff had worked for very short periods at several jobs that he got through Vocational Rehab. He was eventually dropped because they were unable to find a job in the area for him. He had a driver's license but very rarely drove without someone else in the car. He lived with his parents and his older brother. His brother was disabled because of Asperger's. He had regular chores that he was responsible for around the house. Sometimes his parents had to remind him to do his chores. (Tr. 48-53).

Plaintiff took Lithium and Methylphenidate.[3] Those medications helped in that they calmed him down and prevented him from being hyper. He was less likely to get into disagreements with his family. They did not help with his attention span. He watched television and movies but could not sit still through a whole movie. He was fidgety all the time. He had

---

[3] Methylphenidate is used to treat ADHD. See, https://www.drugs.com/methylphenidate.htmlm, visited on February 5, 2019.

problems remembering things.  (Tr. 54-58).  Plaintiff was able to do simple addition and subtraction "on paper" and was able to use a calculator.  He was able to ride his bike to the grocery store and get things that his mother put on a list.  He used a computer to check emails and to look things up on the internet.  He played Xbox games for several hours a day.  He was able to take care of his personal grooming and make himself food.  (Tr. 62-65).

A vocational expert (VE) also testified.  The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment.  The VE testified that this person could do jobs that exist in significant numbers in the local and national economies.  Examples of such jobs are packer, general factory helper, and trimmer.  She also testified that an employer would generally tolerate no more than 10% off-task behavior.  In addition, competitive work would be precluded if a worker required redirection or extra supervision more frequently than every 2 hours.  (Tr. 70-78).

### 3. Medical Treatment

Plaintiff was seen regularly by a psychiatrist, Dr. Shahzad Parvaz.  The earliest record is dated May 12, 2012; it was a follow-up visit.  Plaintiff was taking Vyvanse once a day and Lithium twice a day.[4]  His diagnoses were bipolar II, ADHD, mathematics disorder, and borderline intellectual functioning.  Plaintiff reported that he was doing okay, although he had had arguments with his brother and father and he "loves arguments."  He was reading a book and his concentration was okay.  On exam, he was alert, oriented, and cooperative.  Eye contact was fair.  He had no psychomotor agitation or retardation.  He was fully communicative with normal speech and intact language skills. His mood was good, and his affect was normal.  He had no signs of thought disorder.  Insight and social judgment were fair.   (Tr. 674-675).

Plaintiff saw Dr. Parvaz about every month to two months from May 2012 through the end

---

[4] Vyvanse is used to treat ADHD.  See https://www.drugs.com/vyvanse.html, visited on February 5, 2019.

of 2013. (Tr. 674-698). The notes indicate that plaintiff was doing fairly well during that period, but he was fidgety with excessive talking on some visits. His ADHD medication was increased in September 2013. (Tr. 696-697).

In January 2014, plaintiff's father reported to Dr. Parvaz that plaintiff was doing good, did not get upset easily anymore, and his attention was good. His father said he could do simple, but not complex, tasks. On exam, his attention span was short, and he was distracted at times. Speech was excessive. His mood was good, and his affect was normal. He had normal psychomotor activity. He was to continue on the same medications. (Tr. 699-700).

In February 2014, two days before he applied for disability benefits, plaintiff told Dr. Parvaz that he was doing "pretty good" and his ADHD was fairly well controlled with medicine, although he did feel fidgety at times and talked excessively. On exam, he was alert, oriented, and cooperative. He was fidgety and easily distracted, with a short attention span. His mood was good, and his affect was normal. He was to continue on the same medications and return in two months. (Tr. 701-702).

Plaintiff was seen by Dr. Parvaz five more times in 2014. (Tr. 703-704; 750-757). The notes indicate that plaintiff was doing fairly well. His mood was good most of the time and his ADHD was controlled with medication; when he had symptoms, they were mild. The findings on exam were generally normal except for some notes of fidgetiness and short attention span. In August, Dr. Parvaz noted that plaintiff's vocabulary and fund of knowledge indicated his cognitive functioning was in the below normal range. (Tr. 752). In December, his mother said his insurance would no longer cover Vyvanse. (Tr. 807).

In February 2015, plaintiff and his mother reported that his ADHD symptoms were worse. On exam, he was fidgety with a short attention span. Because his insurance would not cover

7

Vyvanse, Dr. Parvaz prescribed Methylphenidate. (Tr. 812-813). The next month, plaintiff's parents reported that Methylphenidate was "working really well." Findings on exam were normal. Plaintiff was noted to be in "partial remission." (Tr. 815). His dosage of Methylphenidate was increased in March 2015 because he was feeling a little hyper and fidgety. His bipolar symptoms were described as well-controlled with medication. (Tr. 817-818). In May 2015, plaintiff and his mother reported that his ADHD symptoms were better and that he was doing better on the increased dosage. He had no depressive symptoms. (Tr. 820-821).

Dr. Parvaz saw plaintiff two more times in 2015, and three times in 2016. The last visit was in July 2016. (Tr. 822-825; 827-830, 841-842). Plaintiff continued on the same medications at the same dosage throughout. The notes indicate that he did well with only mild and infrequent ADHD symptoms. See, e.g., Tr. 827, 829. At the last visit in July 2016, plaintiff reported that his attention was "okay," and he was forgetting things less often. He said he was organized, except for his room which was a mess. His mother reported that his mood was good with no major ups and downs and no irritability or impulsiveness. She said plaintiff was "perfect" and she had no complaints. On exam, plaintiff was alert and oriented and made good eye contact. His speech was normal. His mood was good, and affect was normal. He had no abnormal movements. His thought process was sequential and logical. Insight and judgment were fair. (Tr. 841-842).

    4.    **Dr. Parvaz' Opinion**

Dr. Parvaz completed a form entitled Mental Impairment Questionnaire in August 2016. (Tr. 849-853). He listed plaintiff's diagnoses as ADHD-combined type; bipolar disorder, Type II; and borderline intellectual functioning, rule out mild intellectual disability. On a checklist of signs and symptoms, Dr. Parvaz checked depressed mood, hostility or irritability, mood swings,

getting angry easily, difficulty thinking or concentrating, easy distractibility, loss of intellectual ability of 15 IQ points or more, and poor immediate, but not remote or recent, memory. The form defined "marked" limitations as symptoms "constantly interfere with ability," meaning "more than 2/3 of an 8-hr. workday." The doctor rated plaintiff as markedly limited in ability to (1) maintain attention and concentration for extended periods; (2) complete a workday without interruptions from psychological symptoms; (3) perform at a consistent pace without rest periods of unreasonable length or frequency; and (4) and make plans independently. The form defined "moderate-to-marked" limitations as symptoms "frequently interfere with ability" or from "1/3 – 2/3 of an 8-hr. workday." The doctor rated plaintiff as moderate-to-markedly limited in ability to (1) remember locations and work-like procedures; (2) understand, remember, and carry out detailed instructions; (3) perform activities within a schedule and consistently be punctual; (4) work in coordination with or near others without being distracted by them; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them; (7) maintain socially appropriate behavior; (8) respond appropriately to workplace changes; (9) be aware of hazards and take appropriate precautions; and (10) set realistic goals.

### 5. Personality and Cognitive Assessment by Dr. Bolinskey

P. Kevin Bolinskey, Ph.D., performed a personality and cognitive assessment on a referral from Dr. Parvaz in September 2016. (Tr. 854-862). He concluded that plaintiff had a Full Scale IQ of 76, which fell in the borderline range. Dr. Bolinskey noted that his score on the verbal reasoning index was significantly higher than his scores on the perceptual reasoning index or the working memory index, indicating that his verbal reasoning ability is significantly more developed that his nonverbal problem-solving abilities or his ability to retain and manipulate information in

short term memory.

### 6. Prior IQ Testing

At age 18, in 2003, IQ testing resulted in Full Scale IQ score of 87, Verbal IQ score of 86, and Performance IQ score of 89. Testing in 2006, at age 21, resulted in Full Scale IQ score of 91, Verbal IQ score of 92, and Performance IQ score of 90. The 2006 scores indicated that he was functioning in the average range of cognitive ability. (Tr. 518-520).

### 7. State Agency Consultant's' Opinions

In May 2014, state agency consultant Howard Tin, PsyD., assessed plaintiff's mental RFC based on a review of the record. (Tr. 121-). Dr. Tin concluded that plaintiff had no limitation in ability to carry out short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual; and ability to sustain an ordinary routine without special supervision. He was moderately limited in ability to carry out detailed instructions; to maintain attention and concentration for extended periods; and interact with the general public. In his narrative explanation, Dr. Tin said that plaintiff was capable of performing unskilled work.

A second state agency consultant reviewed the record in February 2015 and agreed with Dr. Tin. (Tr. 157-159).

## Analysis

Plaintiff first argues that the ALJ erred in assigning little weight to Dr. Parvaz' opinion.

The ALJ gave little weight to Dr. Parvaz' opinion because the marked limitations the doctor assessed were not supported by acceptable medical evidence and were inconsistent with the evidence as a whole. (Tr. 24).

Obviously, the ALJ was not required to credit Dr. Parvaz' opinion even though it was offered by a treating doctor; "while the treating physician's opinion is important, it is not the final

word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ is required to consider a number of factors in deciding how much weight to give to a treating doctor's opinion. The regulations refer to a treating healthcare provider as a "treating source." The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added][5]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

Plaintiff complains that the ALJ did not identify what evidence was inconsistent with Dr.

---

[5] 20 C.F.R § 404.1527 was revised effective March 27, 2017. The old version applies to this case. A new regulation, § 404.1520c, applies to claims filed on or after March 27, 2017. References herein will be to the version of § 404.1527 in effect at the time of the ALJ's decision.

11

Parvaz' opinion, but the ALJ's decision must be read as a whole. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). In the section of the decision preceding the weighing of the opinions, the ALJ reviewed the medical evidence and concluded that Dr. Parvaz' own treatment notes showed that plaintiff had a short attention span at times, but his symptoms improved with medication. See, Tr. 21-22. Thus, the doctor's own treatment records were not consistent with the limitations he assigned.

Plaintiff points out that Dr. Parvaz stated that his opinions were based on evidence of depressed mood, hostility/irritability, mood swings, being angered easily, difficulty thinking/concentrating, easy distractibility, loss of intellectual ability of 15 I.Q. points or more, and poor immediate memory. Plaintiff then cites to entries in the records reflecting symptoms such as only fair eye contact, fair insight and social judgment, lack of attention and organization, and short attention span. See, Doc. 10, pp. 11-12. This argument backfires in that it actually highlights the lack of support for Dr. Parvaz' opinion. The symptoms cited by plaintiff in his brief do not support findings of depressed mood, hostility/irritability, mood swings, or being angered easily. As the ALJ noted, the medical records reflected that plaintiff was generally alert and oriented, cooperative, had normal psychomotor findings, and his mood was good. His mother reported that he did not get angry or argue as often when he was taking his medications. See, Tr. 22.

Plaintiff also argues that the fact that plaintiff had some response to treatment does not contradict Dr. Parvaz' opinion. However, he overlooks the fact that Dr. Parvaz' records indicate that plaintiff had more than just "some" response to treatment. In fact, the records indicate that plaintiff's symptoms were well-controlled by medication. Further, the ALJ did not conclude that plaintiff had no symptoms at all; plaintiff's argument ignores the significant nonexertional

12

limitations assessed by the ALJ. For example, the ALJ limited plaintiff to simple, routine tasks that require little independent judgment or decision-making in two hour segments at a time with a 10-15 minute rest between two segments, at an average production rate pace, but not with stringent speed or strict rate based production requirements; he could be off task for 10 percent of the workday; and he was limited to no interaction with the public and only occasional interaction with co-workers and supervisors.

Plaintiff also argues that the ALJ gave too much weight to the opinions of the state agency consultants who assessed plaintiff's RFC based on a review of the records. Plaintiff does not argue that the ALJ's RFC assessment did not adequately reflect the consultants' opinions.

Plaintiff suggests that it is per se error for an ALJ to credit the opinion of a nonexamining doctor over one who treated plaintiff. The cases he cites at page 15 of his brief do not support that argument. *Vanprooyen v. Berryhill*, 864 F.3d 567, 573 (7th Cir. 2017) and *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) concern a situation where the ALJ, without sufficient explanation, discredited the opinion of a doctor *who examined the plaintiff at the request of the agency*. That is not the case here. Plaintiff inaccurately states the holding of *Beardsley*. According to plaintiff, *Beardsley* holds that "when an ALJ rejects the opinions from an examining source in favor of findings from a non-examining source it 'can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step[.]'" The Seventh Circuit actually said, "But rejecting or discounting the opinion *of the agency's own examining physician* that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley*, 758 F.3d at 839 (emphasis added). Similarly, in *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), the Seventh Circuit said, "An ALJ can reject an examining physician's opinion only for reasons supported by

13

substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." Those cases do not suggest that an ALL is never permitted to credit the opinion of a nonexamining doctor over the opinion of a treating physician.

Plaintiff argues that the opinions of the state agency consultants were stale because they did not review the entire record. In *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), the Seventh Circuit held that the ALJ erred in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage*, 812 F.3d at 1125. In a later case, the Seventh Circuit reiterated the rule. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). Here, however, there was no evidence containing "significant, new, and potentially decisive findings" or "new, significant medical diagnoses." Rather, as the ALJ explained, Dr. Parvaz' treatment records indicated that plaintiff's symptoms were well controlled on medication.

Plaintiff argues that, if he did not give Dr. Parvaz' opinion controlling weight, he was required to consider the factors set out in 20 C.F.R. § 404.1572. He argues that these factors favor crediting Dr. Parvaz' opinion because, in part, Dr. Parvaz provided support for his opinions and his opinions are confirmed by the longitudinal treatment records. See, Doc. 10, p. 16. He is incorrect. As was explained above, the ALJ was justified in concluding that Dr. Parvaz' opinion was not well-supported and was inconsistent with his own records and the record as a whole.

In short, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008);

14

*Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that ALJ Yoder easily met the minimal articulation standard here.

Plaintiff's second point is that the ALJ improperly evaluated his subjective allegations. This point can be swiftly disposed of.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff argues that the ALJ failed to consider the entire period at issue because he said that plaintiff's allegations were "not fully supported prior to July 23, 2015, for the reasons explained in this decision." (Tr. 21). However, the ALJ's discussion of the evidence throughout the decision makes it clear that he did consider the entire period at issue and the reference to July 23, 2015, a date which has no significance in this case, was a harmless scrivener's error. He also argues that the ALJ incorrectly relied on the lack of hospitalization. That argument takes the ALJ's statement out of context. At Tr. 21, the ALJ reviewed the earlier medical evidence, noting that plaintiff was placed in a group home in 2001, but "there is no evidence of inpatient psychiatric or mental health treatment after the claimant's stay at the group home in 2001." The ALJ did not discount plaintiff's allegation because he had not required inpatient hospitalization. Lastly, plaintiff argues that the ALJ improperly equated his daily activities with an ability to work full-time. The

15

Seventh Circuit has cautioned against equating the ability to engage in limited daily activities with an ability to work. *Moore v. Colvin*, 743 F. 3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). This does not mean, as plaintiff seems to think, that the ALJ was prohibited from considering his activities at all. Rather, it is entirely proper for the ALJ to consider all of the evidence, including the claimant's activities. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). The ALJ did not equate his activities with an ability to work full-time; rather, he concluded that plaintiff's activities undercut the reliability of Dr. Parvaz' opinion that he was markedly limited in a number of areas of functioning. (Tr. 24).

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ or make its own credibility determination in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d at 413. Plaintiff has not identified a sufficient reason to overturn the ALJ's findings.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Yoder committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: FEBRUARY 20, 2019**

s/ *J. Phil Gilbert*
J. PHIL GILBERT
U.S. DISTRICT JUDGE